**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MICHAEL G. MARTIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 10525-VCP |
| | : | |
| MED-DEV CORPORATION and | : | |
| THOMAS J. FINLEY, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Date Submitted: July 28, 2015
Date Decided: October 27, 2015

James S. Yoder, Esq., WHITE AND WILLIAMS, LLP, Wilmington, Delaware; Kevin F. Berry, Esq., Kimberly A. Havener, Esq., WHITE AND WILLIAMS, LLP, Philadelphia, Pennsylvania; *Attorneys for Plaintiff Michael G. Martin*.

Michael P. Kelly, Esq., Andrew S. Dupre, Esq., Benjamin A. Smyth, Esq., McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Defendants Med-Dev Corporation and Thomas J. Finley*.

**PARSONS, Vice Chancellor.**

This case involves a dispute over the management of a medical device company. Members of the company's board of directors accused the Chairman and CEO—the plaintiff in this action—of misappropriating company funds, leading to his eventual resignation. Although the plaintiff believed his resignation was contingent on the appointment of two investors to the company's board of directors, the other directors— one of whom, along with the company, is a defendant in this action—took the resignation as unconditional.

The plaintiff brought this action under Section 225 of the Delaware General Corporation Law ("DGCL")[1] to contest the validity of his resignation from the company's board of directors and to invalidate the appointment of the director who replaced him as the Chairman. Both parties also seek an award of attorneys' fees and expenses against the other under the bad faith exception to the American Rule.

The trial was conducted on June 10 and 11, 2015. After post-trial briefing, I heard oral argument on July 28. For the reasons that follow, I conclude that the plaintiff should be reinstated as the company's Chairman, but that the director who replaced him as the Chairman should remain on the board. The defendants are entitled to partial attorneys' fees and expenses against the plaintiff based on a frivolous claim the plaintiff brought against them and pursued until he abandoned it just before trial. I deny the plaintiff's request for attorneys' fees and expenses from the defendants.

---

[1]     8 *Del. C.* § 225.

# I.   BACKGROUND[2]

## A.   Parties

Plaintiff, Michael G. Martin, is the sole incorporator of Med-Dev Corporation ("Med-Dev" or the "Company").  Martin[3] initially served as the Chief Executive Officer ("CEO") and Chairman of Med-Dev's board of directors (the "Board").  He purportedly resigned from those posts on April 19, 2014.  The effect of that resignation and Martin's claim for reinstatement as the Chairman of the Board are at issue in this action.

The defendants are Med-Dev and Thomas J. Finley (collectively, "Defendants").  Med-Dev, a Delaware corporation based in Scranton, Pennsylvania, is a medical device company that was founded in 2012.  Finley[4] has at all times since the Company's inception served as a member of the Board and Med-Dev's President.  Finley replaced Martin as the CEO upon his purported resignation.

Relevant non-parties to this action include William Peters, M.D., and Michael Moore, M.D., Ph.D., who were the other two initial members of the Board, and George Albanese, a Company stockholder who was appointed to the Board on January 16, 2014

---

[2]   Citations to testimony presented at trial are in the form "Tr. # (X)," with "X" representing the surname of the speaker, if not clear from the text.  Exhibits will be cited as "JX #," and facts drawn from the parties' pretrial Joint Stipulation are cited as "JS ¶ #."

[3]   All references to "Martin" throughout this Memorandum Opinion should be understood to mean Michael G. Martin.  Any reference to Mick Martin, another of the Company's original stockholders, will include his first and last name.

[4]   All references to "Finley" throughout this Memorandum Opinion should be understood to mean Thomas J. Finley.  Any reference to Finley's brother, Kevin Finley, will include his first and last name.

and later replaced Martin as the Chairman after his purported resignation. Like Martin, Albanese's current status as a director and the Chairman of the Board is at issue in this action. In conjunction with his resignation from the Board, Martin attempted to cause the addition to the Board of Gregory Rainey and Edward Lipes—stockholders of Med-Dev with experience working in the medical device industry. Joseph Tomasek was the Company's corporate counsel from 2012 until December 2014.

### B. Facts

### 1. Background of the Company

Med-Dev was formed in June 2012 to distribute a novel intra-nasal medical device (the "Clip") that was intended to serve as a non-antibiotic treatment for nasal methicillin-resistant *Staphylococcus aureus* infections. The Clip was developed by Moore and was to be handmade using a silver impregnated fabric material for placement on the nasal septum. In addition to Moore (1,252,500 shares), the Company's founders and original stockholders included Martin (1,252,500 shares), Finley (1,252,500 shares), Peters (1,252,500 shares), Albanese (1,252,500 shares), Frank LaForgia (710,000 shares), and Mick Martin (525,000 shares). Finley was the Company's original President, and Martin was its original Chairman and CEO.

Although the Clip was the only product Med-Dev had when it was founded, in mid-2013, the Company identified an opportunity to obtain the exclusive rights to market two other, market-ready "Infection Control" medical supply products. The Company hoped these two new products could be sold through the same distribution channel that initially was to be used to sell the Clip. Martin believed that to market effectively the two

Infection Control products, Med-Dev needed to hire a Chief Operating Officer ("COO") with relevant experience. He, therefore, reached out to Eric Suchecki, a recent Company investor, in or around November 2013, to discuss the possibility of Suchecki serving as Med-Dev's COO. According to Martin, Finley reacted negatively to this suggestion and stated that he would "not report[] to anybody."[5]

### 2. Albanese's election to the Board

On January 16, 2014, the Board held a meeting at which Martin presided as Chairman. At that meeting, a motion was made to expand the Board from four to five directors and to appoint Albanese as the fifth director. Martin objected, contending that the nomination and proposed election of Albanese were defective under the Company's bylaws (the "Bylaws"). Martin based his objection on his understanding that the Bylaws required notice to stockholders before the appointment of a new Board member. Ultimately, Martin agreed to vote in favor of expanding the Board and Albanese's appointment to the Board, but said that he was "going to get a legal opinion on [the appointment process's compliance with the Bylaws] after the meeting."[6] Hence, the Board voted unanimously on January 16, 2014 to expand to five members and appoint Albanese to fill the new seat.

After the January 16 Board meeting, Martin contacted Tomasek and requested a copy of the Bylaws, which Tomasek forwarded to both Martin and Finley. Martin also

---

[5]    Tr. 248.

[6]    Tr. 156 (Martin).

4

emailed Albanese regarding his initial opposition to Albanese's appointment to the Board, stating, "Somehow, I am being cast as your enemy. Not so, but if you believe it, so be it. Both you and I can be successful on our own, but somehow I thought we worked better together."[7] The evidence is unclear as to whether Martin formally pressed his objection to Albanese's appointment after the January 16 meeting.[8] In that regard, Martin alleges that Albanese resigned at some point between January 16 and April 19, 2014, but he failed to adduce any probative and persuasive evidence of such a resignation.[9] Defendants, on the other hand, point to several emails regarding Board

---

[7] JX 27.

[8] *Compare* Tr. 126 (Finley) ("Mr. Albanese told me that he had been contacted by Mr. Martin and that Mr. Martin had engaged a Delaware law firm that had provided an opinion that George was illegally elected to the board in January of 2014."), *with* Tomasek Dep. 121-22, 124 (stating that he did not recall if Martin had complained to him about Albanese's election and that he would have investigated the circumstances of Albanese's appointment, but did not do so, had an objection been raised), *and* Tr. 86, 111 (Finley) (stating that Martin did not continue to object to Albanese's appointment after the January 16 meeting).

[9] Martin cites to Tomasek's deposition for the proposition that Albanese resigned from the Board after the January 16, 2014 meeting. In the relevant part of his testimony, Tomasek stated that, in March 2014, the Board had splintered into two competing camps: Finley and Moore versus Martin and Peters. Tomasek Dep. 38-39. Plaintiff argues that, by negative implication, because Tomasek only mentioned four directors and did not include Albanese, that Albanese must have resigned from the Board. Plaintiff also points to Tomasek's testimony that "Albanese stat[ed] to [Tomasek] that [Albanese] didn't know if he was on the [Board] or not." Tomasek Dep. 23-24. In addition, Martin notes that in the Written Consent that Tomasek drafted to effectuate Martin's resignation, only Martin, Finley, Peters, and Moore are recognized as Board members and the number of authorized director positions is listed as "four." JX 70. I attribute these inconsistencies to Tomasek's forgetfulness and carelessness, however, rather than as reliable indicia of Albanese's resignation. None of this evidence directly states

5

business during the relevant time period that Martin sent to Med-Dev's other directors, including Albanese, as support for their position that Albanese never resigned from the Board after his January 16 appointment.[10] In addition, on April 11, 2014, Rainey communicated to Martin his understanding that the Board consisted of Martin, Finley, Moore, Peters, and Albanese, and there is no evidence Martin corrected him.[11]

### 3. Finley's investigation into Martin's Company expenses

On January 23, 2014, Martin learned that Finley had caused Med-Dev to close, without notice to Martin, the joint account held at Wells Fargo Bank that had been used for Med-Dev's business. When Martin asked Finley about the account closure, Finley responded that he had moved the account because he thought Martin was misappropriating Company funds. Specifically, Finley had been monitoring Med-Dev's finances since its inception in 2012 and, in late 2013, noticed that some of Martin's reimbursements from the Company appeared to be for non-Med-Dev purposes. Upon further investigation, Finley identified approximately twenty instances in which Martin allegedly misused Company funds. Martin ultimately admitted that at least two of those instances did involve expenses that should not have been charged to Med-Dev.

---

or describes the circumstances surrounding Albanese's purported resignation. Further, it is undisputed that at the January 16, 2014 meeting, the size of the Board was expanded from four members to five. JS ¶ 17. Based on the absence of any evidence that the Board's size was reduced to four members, I consider the statement in the Written Consent as to the Board's size to be simply an error on Tomasek's part.

[10] JX 32, 40, 47, 55, 56, 58, 62, 63.

[11] JX 58.

6

Finley discovered, for example, that Martin used his Med-Dev debit card on February 14, 2012 to pay $2,500 to the law firm Mauro, Savo, Camerino, Grant & Schalk ("Mauro Savo").[12] Tomasek shared office space with Maura Savo and occasionally would "farm out" litigation matters to that firm because he was not a litigation attorney. When questioned about the $2,500 charge, Martin first claimed that it was for legal work related to Med-Dev's founding that Tomasek had referred to Mauro Savo. After Tomasek denied farming out any Med-Dev-related work to Mauro Savo, Martin stated, in a March 25, 2014 email to Tomasek, that he had made a mistake and that the $2,500 payment, in fact, pertained to a different entity that was not affiliated with Med-Dev.

Martin also used his Med-Dev debit card to pay $23,267 to Baltusrol Country Club in New Jersey.[13] Martin and other Med-Dev employees, including Finley, used Baltusrol "to entertain prospective investors, sales management, possible mergers, potential employees, distributors, doctors, analysts, [investment banks], and customers."[14] Of that $23,267, Martin admitted, in a March 31, 2014 email to Tomasek, that $8,783 was paid for non-Med-Dev expenses.[15]

---

[12]    JS ¶ 25.

[13]    JS ¶ 32.

[14]    JX 32.

[15]    JX 56.

7

### 4.    Martin's resignation from the Board

As the controversy regarding Martin's Company expenses was coming to a head, the other members of the Board considered whether to remove Martin as a director. On April 15, 2014, Tomasek circulated a memorandum to the Board members, with the exception of Martin, regarding whether the Bylaws permitted the Board unilaterally to remove him.[16] Tomasek concluded the answer was no and that removing Martin from the Board would require stockholder approval. By then the conflict had grown to the point that "corporate activity seemed to have frozen."[17] Although Peters supported Martin, the other directors no longer were speaking to Martin, and the Board became "deadlocked."[18] Eventually, Martin suggested to Tomasek that it might be necessary for him to resign to move the Company forward and indicated that he would be willing to do so, on the condition that Lipes and Rainey be elected to the Board. Tomasek then conveyed the proposed terms of Martin's resignation to Finley, who said it was a "good idea."[19]

To effectuate this plan, Tomasek drafted a resignation letter and a Unanimous Written Consent of Directors of Med-Dev (the "Written Consent"), pursuant to which Martin's resignation was contingent on the appointment of Lipes and Rainey to the

---

[16]    JX 68.

[17]    Tomasek Dep. 39.

[18]    *Id.*

[19]    *Id.* at 40.

Board.[20] Tomasek sent those two documents to Martin on April 18, 2014 and separately forwarded the documents to the rest of the Board members for their review. In his transmittal email to Martin, Tomasek stated, "I have also attached the Board Consent, appointing [Lipes] and [Rainey] to serve as Board members. [Lipes] and [Rainey] shall be appointed once the D&O insurance is bound, scheduled for early next week."[21] Martin admits that he did not read the draft resignation letter Tomasek sent him on April 18. He focused, instead, on the Written Consent, which he found acceptable.

The Board, *sans* Martin, held a conference call on April 18, 2014, and requested that Tomasek remove the contingency in the resignation letter as to the appointment of

---

[20]    JS ¶ 35. The draft resignation letter stated:

> Please accept this, my resignation as an officer and director of Med-Dev Corporation, effective upon the appointment of Messrs. Ned Lipes and Greg Rainey to serve as members of the Board of Directors of Med-Dev Corporation. If, in fact, the appointment of Messrs. Lipes and Rainey to the Board of Directors does not take place on or before 5:00 PM, Eastern Time, April 25, 2014, then this Resignation shall be automatically rescinded at such time.

JS ¶ 37. Similarly, the Written Consent stated:

> [T]he Board has received the Resignation of Michael G. Martin from the Board of Directors and as an officer of Med-Dev and now desires to appoint Edward Lipes and Gregory Rainey to serve as members of the Board of Directors.

JS ¶ 38.

[21]    JX 70.

9

Lipes and Rainey so that the Board could vet their qualifications first.[22] Tomasek modified the letter as requested and emailed Martin the revised resignation letter, which simply stated "Please accept this, my resignation as Chief Executive Officer and as Chairman of the Board and director of Med-Dev Corporation, effective 5:00 PM, Eastern Time, April 19, 2014."[23]

In his email, Tomasek did not mention that he had changed the resignation letter or that the Board wanted to vet Lipes and Rainey prior to appointing them. Although Tomasek testified that he did discuss, at some point, both of those issues with Martin,[24] Martin's April 21 email to Rainey, Lipes, Tomasek, and Peters indicates that Martin was under the impression that once his resignation was submitted and the directors and officers ("D&O") insurance policies were effective, Lipes and Rainey would be

---

[22] Tomasek Dep. 118-19.

[23] JS ¶ 41.

[24] Tomasek Dep. 52 ("I obviously did [discuss the change in the language of the resignation letters with Martin]. I would have."); *Id.* at 118-19 ("I had mentioned to [Martin] . . . that [Lipes and Rainey] were going to the Board of Directors . . . the Board had not told me when they told me to change the resignation getting rid of the contingency language that they were not going to appoint or consider appointing the two gentlemen Rainey and Lipes to the Board. The whole point was that they needed to vet their qualifications and that's what I'm sure I explained to [Martin] as the reason that he should sign the unconditional resignation. I said they're going to interview these guys, I'm sure that these guys are going to be qualified, you need to sign this resignation so that . . . the company can move on and get things done.").

appointed to the Board.[25] Martin executed the updated resignation letter and emailed it to Tomasek on April 19, copying Peters on that email. Tomasek then sent the signed resignation letter to the rest of the Board on April 20. As Martin admits, because he concededly did not read the initial resignation letter containing the conditional language, he was unaware that any changes had been made to the resignation letter when he signed it.[26] Martin did read the Written Consent that accompanied the first resignation letter. Tomasek did not include a Written Consent with the second resignation letter, but he also did not indicate to Martin that there would be any changes to the original Written Consent.[27] Thus, Martin testified credibly that he believed, at all times, that his resignation was conditioned on the appointment of Lipes and Rainey to the Board.[28] And, Tomasek acknowledged that he understood that Martin viewed his resignation as contingent on Lipes and Rainey's appointment to the Board, even after Martin signed the unconditional resignation letter.[29]

---

[25]    JX 78 ("I am asking Joe Tomasek to schedule a BOD teleconference for Thursday morning [presumably April 24, 2014] at 8 AM. By that time Finley should have the D&O Insurance and the resignation and new BOD acceptances should seamlessly occur.").

[26]    Tr. 267.

[27]    Tr. 266-69 (Martin).

[28]    Tr. 169-72, 260-61 (Martin).

[29]    Tomasek Dep. 52-53.

### 5. The Board's actions after Martin's resignation

On April 21, 2014, Martin emailed Lipes, Rainey, Tomasek, and Peters requesting a Board meeting to allow his resignation and the appointments of Lipes and Rainey to occur "seamlessly."[30] On April 25, 2014, Finley issued a memorandum to the Board stating that Martin had resigned and that he was calling a special emergency meeting of the Board on April 29 to: (1) accept Martin's resignation; (2) retroactively terminate Martin's consulting agreement; and (3) appoint Albanese to fill Martin's vacancy.[31] At that meeting, the Board appointed Albanese to fill the Chairman position vacated by Martin.[32] There is no indication that the Board discussed the possibility of appointing Lipes or Rainey as directors at the April 29 meeting. Although Finley's memorandum purportedly was sent to the full Board,[33] Peters did not receive notice of, or participate in,

---

[30]   JX 78. Martin apparently held the mistaken belief that the Board had to accept his resignation before it became effective. As discussed in Section II.B.2 *infra*, that is incorrect.

[31]   JX 1 at LACK_000337-41.

[32]   JX 72. Martin claims that JX 72—Finley's notes from the April 29 Board meeting—indicates that Albanese resigned from his Board position sometime after his January 16 appointment. Plaintiff relies on the statement in Finley's notes that a motion was made "to add G. Albanese as a BOD to fill [Martin's] vacancy [previously] added to BOD 1/16/14." *Id.* Because the notes indicate that Albanese previously was added to the Board on January 16, the date of his original appointment, and do not mention that Albanese ever resigned, I find unpersuasive Martin's contention that the notes provide conclusive evidence that he resigned at some point after his original appointment. Instead, I find it more likely, based on the absence of any direct evidence that Albanese resigned from the Board, that Finley's notes mean that, at the April 29 meeting, the Board selected Albanese, as a current Board member, to fill Martin's vacant Chairman position.

[33]   See JX 1 at LACK_00337.

the April 29 meeting.  After the meeting, Peters promptly emailed Finley to voice his

frustration:

> I disagree completely with conducting board related business
> in my absence. I was not notified of the election of people to
> the board. If I was notified of such actions I would have
> requested that the board meeting be arranged to permit my
> attendance. No proper notification was provided that such
> action was to be taken.[34]

On April 29, Rainey emailed Finley, copying Albanese, Peters, Moore, Tomasek,

and Lipes, stating, "It has been over a week since [Martin's] resignation from the

[Board]. It was my understanding that [Lipes] and I would be joining the board."[35]

Finley responded by notifying Rainey that the Board had accepted Martin's resignation

---

[34]   JX 137.  Defendants object to the admission of this email chain as evidence. Martin obtained the email chain from Peters just before trial and forwarded it to Defendants when it was received.  *See* Tr. 59-63 (Finley).  Defendants object to this evidence on the grounds of untimeliness and unfair surprise.  As Martin points out, however, Finley was copied on all of these emails and responded to some of them.  *See* JX 137.  In addition, although Defendants argue that Martin could have sought discovery from Peters earlier because he was a friendly witness, Defendants, likewise, could have sought discovery from Peters and obtained the evidence earlier.  In fact, given Peters' role as one of the four initial Board members, he appears to have been an obvious potential source of relevant evidence.  Trial courts must balance their duty "to admit into evidence all relevant and material facts" with their "correlative duty of enforcing standards of fairness and compliance with the Rules [of Evidence]."  *Hoey v. Hawkins*, 332 A.2d 403, 407 (Del. 1975).  Because Defendants presumably knew of this evidence's existence and could have obtained it earlier from Peters, and because Defendants have not shown that Martin delayed providing it to them once he received it, I do not consider the emails to be untimely or to constitute an unfair surprise. Accordingly, I overrule Defendants' objection and admit JX 137.

[35]   JX 137.

13

and elected Albanese to fill his vacancy.[36] Finley further indicated that the Board would make a motion at the next meeting to nominate Rainey as an independent Board member and that the Board needed to review Lipes's resume before considering his appointment. Lipes sent his resume and biographical information to Finley that same day. On May 2, 2014, Lipes emailed Finley that he was "anxious to see Med-Dev moving towards product launches as soon as possible" and asking when he and Rainey could join the Board.[37] On the same day, Rainey emailed Finley again and echoed Lipes's sentiments, asking "wasn't [Martin's] resignation contingent upon [Lipes] and I being installed onto the board within a specific time frame?"[38] Rainey further stated that they "certainly want to stay within that time frame or we will be faced with the situation of [Martin] rejoining the board and then leaving it again."[39] In another email, Peters expressed his agreement with Rainey.

On May 1, 2014, Martin wrote to Tomasek asking whether "there [was] any update on [Rainey] and [Lipes] being added to the [Board]?"[40] Later that day, Peters forwarded Martin an email from Finley announcing to third parties that Martin had resigned from the Board. Martin forwarded that email to Tomasek saying that "[Martin]

---

[36]     *Id.*

[37]     *Id.*

[38]     *Id.*

[39]     *Id.*

[40]     JX 85.

thought [his] resignation was effective only after [Lipes] and [Rainey] were added to the [Board]."[41] Martin then wrote to Tomasek on May 2, 2014 and purported to rescind his resignation because Lipes and Rainey had not been appointed as directors.[42] According to Martin, Tomasek responded that the Board had "backed out of the deal."[43] Finley testified that the Board ultimately decided not to appoint Lipes and Rainey because: (1) they felt that Lipes and Rainey did not share their concern regarding Martin's Company expenses; and (2) they were troubled by the fact that Lipes and Rainey had assigned their proxies to Martin.[44]

On May 7, 2014, Peters also submitted his resignation from the Board. On August 20, 2014, Finley distributed a newsletter to Med-Dev investors announcing both that he was succeeding Martin as the CEO and that his brother, Kevin Finley, and Deanne Dulik Garver, Ph.D., had been appointed to the Board.[45] On September 2, Rainey emailed Finley, copying Lipes, Albanese, and Moore, to express his irritation with the Board's actions since Martin's resignation:

> In April, Ned Lipes and I presented our CV's to you and your board of directors. To date? Nothing. Yet you have the time to appoint two new directors, one your brother and the other an individual whom you describe as having significant

---

[41]    JX 86.

[42]    JX 87.

[43]    Tr. 173.

[44]    Tr. 120-22.

[45]    JX 104 at P_000510-11.

15

industry experience. Great. You take the cumulative 75+ years of experience between Ned and myself and totally ignore that in favor of a family member and someone no one knows. . . . The unprofessionalism that you have exhibited in this and other matters regarding me and other investors whom I have introduced to Med Dev is repugnant.[46]

## 6.    The Lackawanna County criminal investigation of Martin

In or around March 2014, while the Board was investigating Martin's expenses, Finley engaged a Scranton attorney and former prosecutor, Amil Minora, Esq., to represent Med-Dev.[47] According to Defendants, Minora was hired because Tomasek had represented Martin in various personal and business matters for over twenty years.[48] Martin, on the other hand, alleges that Minora was hired primarily because of his contacts at the Lackawanna County District Attorney's Office (the "LCDA").[49] On May 6, 2014, after Martin's April 19 resignation from the Board, Minora complained to the LCDA on Med-Dev's behalf regarding Martin's Company expenses and alleged they constituted theft.[50] Lackawanna County Detective Lisa Bauer handled the criminal investigation.

In connection with its complaint, the Company disclosed the $2,500 payment that Martin caused the Company to make to Mauro Savo. Med-Dev also claimed that Martin

---

[46]    JX 105.

[47]    Minora evidently still worked part-time as a Lackawanna County Assistant District Attorney. *See* JX 131.

[48]    JX 55.

[49]    JX 131.

[50]    JX 1 at LACKA_000003.

16

improperly paid $70,000 of Company funds to Scotland Yarns, LLC, a company he owned, and that Martin had loaned Tomasek $10,000 from Med-Dev's funds. Minora also requested that Bauer look into theft claims that had been made against Martin in connection with his 2009 arrest in Bergen County, New Jersey.

In 2009, Martin was arrested in Bergen County on charges of theft by deception for allegedly falsifying information on financial documents (the "2009 Arrest"). Martin eventually entered a pretrial intervention program, under the terms of which Martin said the charges against him would be dismissed and expunged in exchange for his cooperation with prosecutors. The charges against Martin were dropped, but the 2009 Arrest was never expunged. Finley and Tomasek apparently knew of the 2009 Arrest before Med-Dev's founding, but they were under the impression that it had been expunged from Martin's record. In May 2014, however, Tomasek learned that the arrest never had been expunged. On May 20, Tomasek emailed the Board claiming that Martin had "deceived" him into believing the 2009 Arrest had been expunged and advising them that a potential issue might exist regarding Med-Dev's duty to amend prior stockholder filings to disclose the 2009 Arrest.[51]

Based on the information Finley provided, Bauer obtained two search warrants. The first was to obtain Martin's bank records; the second sought Med-Dev's bank records in order to verify what Finley and Minora had reported. After the search warrants were issued, Martin retained counsel to defend him against Med-Dev's criminal accusations.

---

[51] JX 96.

On July 25, 2014, Minora sent Martin's counsel a proposed settlement agreement that, according to Minora, Martin's counsel had invited and asked him to draft.[52] In addition, Bauer agreed to a request from Martin's attorneys to put the investigation on hold so the parties could attempt to settle the matter. Minora's proposed settlement agreement stated that "[the LCDA] believes probable cause exists to charge Martin with criminal conduct" and called for Martin to relinquish all interests in Med-Dev in exchange for the termination of the Lackawanna County criminal investigation.[53] Minora then sent

---

[52] Minora Dep. 37-38.

[53] JX 101. Defendants object to the admission of this evidence regarding their settlement negotiations under Delaware Rule of Evidence ("D.R.E.") 408. Under Rule 408:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution.

D.R.E. 408. Insofar as Martin is utilizing this evidence to justify the reasonableness of his delay in bringing this action—*i.e.*, for purposes of refuting Defendants' laches affirmative defense—I hold the evidence is admissible, as it is offered to "negativ[e] a contention of undue delay." *Id.*

Plaintiff also is using this evidence to support his claim for attorneys' fees under the bad faith exception to the American Rule, claiming that it is admissible under

18

Martin's attorney an email that threatened to seek criminal charges if Martin did not agree to Med-Dev's proposed settlement.[54]  Thereafter, Martin retained different defense counsel and declined to settle with the Company.  The investigation then resumed.

On August 28, 2014, Martin's new defense counsel, Henry Hockheimer, Esq., sent a letter to Minora notifying him that he believed Minora's threat of criminal action was made to gain an advantage in a civil matter and could be unlawful and in violation of the Pennsylvania Rules of Professional Conduct.[55]  Minora responded to Hockheimer on August 29 by withdrawing Med-Dev's settlement offer.[56]  On September 2 and 4,

---

this Court's decision in *Paige Capital Management, LLC v. Lerner Master Fund, LLC*, which held that "Rule 408 does not exclude the introduction of settlement-related evidence if the evidence is being introduced to prove a claim arising out of a wrong committed during settlement negotiations."  22 A.3d 710, 726 (Del. Ch. 2011).  As Defendants point out, Martin is attempting to use settlement evidence to prove their liability for his attorneys' fees for allegedly acting in bad faith.  In particular, Martin claims that Defendants acted in bad faith by making a baseless criminal charge against him and then attempting to extort a settlement from him by offering to halt the criminal investigation in exchange for his relinquishment of all interests in the Company.  Defendants contend this is explicitly forbidden by Rule 408, as it constitutes using "[e]vidence of . . . offering . . . valuable consideration . . . to prove liability for . . . [a] claim."  Rule 408, however, only forbids using evidence of a settlement offer to prove or disprove liability for the claim being settled.  In this case, Martin is using evidence of Defendants' offer to drop the criminal charges in Lackawanna County to prove that they committed a wrong during the settlement negotiations that supports his fee-shifting claim.  Martin does not seek to use the disputed evidence to prove or disprove his liability as to the underlying criminal charges.  This falls within the exception to Rule 408 articulated in *Paige Capital Management, LLC*; thus, the evidence is admissible.

[54]   JX 1 at LACKA_000041.

[55]   *Id.* at LACKA_000033.

[56]   JX 132.

19

Hockheimer sent letters to Bauer, expressing concern that Med-Dev might be using the assistance of law enforcement to gain an advantage over Martin in a civil dispute and explaining the circumstances surrounding Martin's allegedly improper Company expenses.[57]

To evaluate Hockheimer's explanations regarding Martin's expenses, Bauer interviewed Tomasek. In the interview, Tomasek told Bauer that:

> [T]here [was] something personal going on with Mr. Finley and Mr. Martin because it seems like Mr. Finley came after Mr. Martin with a vengeance demanding a criminal investigation instead of coming to Attorney Tomasek and asking him to look into the matter and try to work it out. He added that things with Mr. Martin and Mr. Finley seemed to be going great, and then Mr. Martin told Mr. Finley that Med-Dev needed someone else with experience to come in, and . . . Mr. Finley thought that Mr. Martin was trying to get rid of him, and maybe that's why he is taking this situation to the extreme.[58]

Tomasek also informed Bauer that the 2009 Arrest stemmed from a disgruntled investor and that the charges ultimately were dismissed.[59] Despite Finley's continued urging that Bauer revisit the 2009 Arrest, she concluded that it had no bearing on her investigation, and she never reached out to Bergen County.[60]

---

[57]     JX 133-34.

[58]     *Id.* at LACKA_000008.

[59]     JX 1 at LACKA_000007-08.

[60]     Bauer Dep. 69-72.

20

Bauer interviewed Martin on September 22, 2014 and, shortly thereafter, concluded that the dispute between Martin and Med-Dev was civil in nature and there was insufficient evidence to pursue criminal charges.[61] Bauer also requested that District Attorney Anthony Jarbola review the evidence and provide his opinion. Upon review of Bauer's report, Jarbola concurred with her conclusion.[62] Finley then reached out to another Lackawanna County Assistant District Attorney, Eugene Talerico, to try and convince him to keep the criminal case against Martin open. After reviewing Bauer's report, however, Talerico agreed with Bauer and Jarbola that insufficient evidence existed to pursue criminal charges.[63] The LCDA's criminal investigation ultimately closed on October 1, 2014 without Martin being arrested or charged.

### C.   Procedural History

Martin filed his original complaint on January 7, 2015. Defendants filed a motion to dismiss on February 2, in response to which Plaintiff filed an amended complaint on March 9. Defendants then withdrew their motion to dismiss and filed an answer. After the parties engaged in discovery and, in conjunction with the pretrial briefing, Martin moved to amend his complaint again—this time to comport with evidence obtained during discovery.

---

[61]   *Id.* at LACKA_000009-13.

[62]   *Id.*

[63]   Bauer Dep. 89-93.

21

In his motion, Plaintiff proposed to make three categories of amendments: (1) the removal of the originally pled Count II, which argued that Albanese's appointment to the Board was invalid because his appointment allegedly violated the Bylaws (the "Old Albanese Claim"); (2) the assertion of a new Count II and related allegations that Albanese must be removed as Chairman of the Board and a director because Martin's resignation was ineffective, void, or voidable (the "New Albanese Claim"); and (3) other miscellaneous allegations unrelated to categories (1) and (2). Defendants opposed Plaintiff's motion as to the Old Albanese Claim on the grounds that they needlessly had incurred attorneys' fees and otherwise been forced to expend time and resources defending against a claim that they always contended was frivolous, but was being withdrawn only belatedly. Further, Defendants opposed Martin's motion as to the New Albanese claim on the grounds that they may be prejudiced because the claim was not brought in a timely manner. On June 11, 2015, I granted Plaintiff's motion as to all three of his requested categories of amendments and allowed him to file his second amended complaint (the "Complaint"). I did so, however, without prejudice to Defendants' ability to seek fees and expenses relating to the Old Albanese Claim and to argue that the admission of evidence relating to the New Albanese Claim had prejudiced Defendants' ability to defend this litigation on the merits.

I presided over a trial of this summary proceeding pursuant to 8 *Del. C.* § 225 on June 10 and June 11, 2015. I ordered the parties to submit simultaneous post-trial briefs on July 10 and to treat those briefs as answering briefs to the arguments made in their adversary's respective pretrial briefs. Post-trial oral argument was held on July 28. This

22

Memorandum Opinion reflects my post-trial findings of fact and conclusions of law in this matter.

## D. Parties' Contentions

Plaintiff, Martin, contends that his resignation was invalid and, therefore, that he should be reinstated to the Board, on three bases. First, Martin claims that his oral resignation—which was made conditional on the appointment of Lipes and Rainey to the Board—rather than his written, unconditional resignation letter has legal effect. Second, Plaintiff argues that the unconditional, written resignation letter is unenforceable under general contract principles because: (a) he lacked intent to be bound; (b) the resignation letter lacked sufficiently definite terms; and (c) Defendants failed to provide sufficient consideration. Finally, Martin argues that his resignation was obtained improperly under false pretenses and as a result of Defendants' and Tomasek's misrepresentations and knowing silence.

Martin also claims that Albanese's position on the Board should be invalidated because Albanese replaced Martin as the Chairman after Martin's resignation and, according to Plaintiff, that purported resignation was ineffective. Consequently, because Martin's resignation should have no legal effect, neither should the Board's appointment of Albanese to replace him as Chairman.

Regarding Martin's argument as to the validity of his resignation, Defendants respond that Martin's oral resignation was superseded by his unconditional, written resignation letter. Defendants also maintain that Martin's contract-based arguments are misplaced because director resignations are statutory, rather than contractual, documents.

23

And, to the extent that Plaintiff claims that his resignation was the result of Defendants' fraudulent inducement, Defendants insist that the facts do not support such a finding.

Martin also contends that Albanese's position on the Board depends on whether Martin resigned on April 19, 2014, as Defendants contend, because Martin alleges that Albanese resigned from his position as the purported fifth director before April 19. Defendants assert that Plaintiff never proved that Albanese resigned after his original appointment to the Board. As a result, if Albanese was a Board member at the time of Martin's resignation, then the validity of Martin's resignation would affect whether Albanese is the Chairman, but would have no bearing on the validity of Albanese's position as a director.

Defendants also assert equitable defenses of laches, waiver, acquiescence, and estoppel, and claim that both Counts I—regarding Martin's resignation—and II—regarding Albanese's appointment—of the Complaint are barred by Martin's delay in bringing this action. Martin counters by asserting that Defendants' unclean hands prevent them from utilizing equitable defenses. He bases that argument on Defendants' alleged bad faith conduct in this action and their attempted prosecution of Martin in Lackawanna County.

Finally, both parties seek an award of attorneys' fees from the other under the bad faith exception to the American Rule. As described above, Martin maintains that he is entitled to attorneys' fees from Defendants because of their alleged bad faith conduct in this action and their attempted prosecution of him in Lackawanna County. Defendants, on the other hand, seek to recover attorneys' fees from Plaintiff because of his bad faith

24

in bringing and litigating this action, particularly as it relates to the multiple iterations of his claims regarding the validity of Albanese's position on the Board.

## II. ANALYSIS

### A. Legal Standard

"Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence."[64] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[65] "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[66]

### B. The Validity of Martin's Resignation from the Board

Martin brought this action to invalidate his resignation from the Board and to obtain a declaration reinstating him as Chairman under Section 225(a) of the DGCL, which grants this Court authority to determine "the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any

---

[64] *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

[65] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[66] *OptimisCorp*, 2015 WL 5147038, at *55.

person to hold or continue to hold such office."[67]  Section 141(b) of the DGCL states that

"[a]ny director may resign at any time upon notice given in writing or by electronic transmission to the corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events."[68]  "Determining whether a director or officer has resigned is a question of fact determined by the circumstances of each case."[69]  "In general, a director may resign verbally through a sufficiently clear manifestation of his or her intent to resign.  Although the magic words 'I resign' may not be necessary, there must nonetheless be some objective manifestation of words or actions to that effect."[70]  "In a related context it has been held that 'loose and ambiguous language will not be regarded as sufficient to prove the resignation of a corporate officer, at least where the subsequent acts and declarations of the officer are inconsistent with any such contention.'"[71]

---

[67]   8 *Del. C.* § 225(a).

[68]   8 *Del. C.* § 141(b).

[69]   *Dionisi v. DeCampli*, 1995 WL 398536, at *8 (Del. Ch. June 28, 1995) (citing *Bachmann v. Ontell*, C.A. No. 7805, at 6 (Del. Ch. Nov. 16, 1984); *Lasher v. Inter-Continental Biologics, Inc.*, 1984 WL 137716, at *8 (Del. Ch. June 14, 1984)).

[70]   *Oracle P'rs, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *16 (Del. Ch. May 21, 2014), *aff'd*, 97 A.3d 1029 (Del. 2014).

[71]   EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 141.05 at 4-316 (6th ed. 2015) (quoting *Lasher*, 1984 WL 137716, at *8).

With these principles in mind, I turn to Plaintiff's three arguments, stated above, as to why his April 19, 2014 unconditional, written resignation from the Board was ineffective. I address each of those arguments in turn.

### 1. Did Martin orally resign and, if so, was that resignation effective?

Martin argues that, at all times, he intended his resignation to be conditional on the appointment of Lipes and Rainey to the Board. Plaintiff communicated this intent to Tomasek, who was acting on behalf of the Company. Tomasek acknowledged that Martin always intended his resignation to be conditional and testified that he communicated this intention to Finley who agreed that Martin's conditional resignation was a "good idea."[72] Plaintiff, therefore, contends that any subsequent writing confirming his resignation was unnecessary and ineffective because his initial oral, conditional resignation was communicated to Med-Dev via Tomasek and represented an objective manifestation of Martin's intent to resign.[73]

I find as a matter of fact, however, that Martin's verbal communications with Tomasek were not sufficiently definite to constitute an objective manifestation of Martin's intent to resign. Rather, Martin's communications with Tomasek represented preliminary discussions regarding Martin's willingness to resign conditionally, if that was agreed to by the Board. Both Martin and Tomasek testified that "Martin suggested" that he should resign when they were discussing how to resolve the conflict on the Board, so

---

[72] Tomasek Dep. 40, 52-53.

[73] *See Oracle P'rs, L.P.*, 2014 WL 2120348, at *16-17.

that the Company could move forward.[74] It does not appear, based on the evidence in the record, that either Tomasek or Martin took those suggestions to be controlling. Rather, Tomasek proceeded to draft formal documents regarding the resignation and sent them to Martin. Although oral resignations generally are permissible under Delaware law,[75] Martin's communications with Tomasek and, through him, to the Board were not sufficiently clear manifestations that he had a present intention to resign. Thus, I conclude that Martin's purported oral, conditional resignation is legally ineffective.

### 2. Is Martin's written resignation unenforceable under general contract principles?

Martin argues that "[t]his Court has consistently applied basic contract principles when determining whether or not to enforce a director's resignation."[76] Defendants, on the other hand, assert that "[d]irectorship resignations pursuant to 8 *Del. C.* §141(b) are

---

[74] Tomasek Dep. 40; Tr. 169 (Martin).

[75] *See, e.g.*, *Oracle P'rs, L.P.*, 2014 WL 2120348, at *16-17 (finding that a director's oral resignation was effective because the resigning director and the other directors who heard his oral statement understood that he was resigning immediately); *Boris v. Schaheen*, 2013 WL 6331287, at *17-18 (Del. Ch. Dec. 2, 2013) ("[A] director may resign orally. Subsequent actions consistent with an oral resignation can support finding a resignation without written notice."); *Dionisi*, 1995 WL 398536, at *8 (finding a director's oral resignation effective because he made it clear that he was resigning immediately from all of his positions with the company) (quoting *Bachmann v. Ontell*, 1984 WL 8245, at *2 (Del. Ch. Nov. 27, 1984) ("I can conceive of circumstances where a completely illogical result would follow from the refusal of the law to recognize an oral resignation clearly given.")).

[76] Pl.'s Post-Trial Br. 42.

creatures of statute, not contract."[77]  Resolution of this dispute as a threshold matter is important because a number of Martin's contentions regarding the invalidity of his unconditional resignation letter are couched in terms of contract law.  On that premise, Plaintiff contends that his written resignation is unenforceable for want of essential elements of a contract, including the intent to be bound, definite terms, and consideration.

Based on the plain language of Section 141(b), I conclude that Defendants' characterization of director resignations as statutory, rather than contractual, instruments is accurate.  Although Delaware courts have applied contract law principles to interpret documents relevant to Section 225 claims,[78] the only requirement in Section 141(b) for a director's resignation to be effective is that it be communicated to the corporation.[79]  The history of Section 141(b) supports this conclusion.  Under the prior common law rule, a board had to accept a director's resignation in order for the resignation to be effective, but that requirement was removed by the 1968 amendment to that section.[80]  I see no reason to read additional elements for an effective resignation into Section 141(b) beyond what the statute itself requires.  Thus, I reject, as a matter of law, Plaintiff's claim that his written resignation is unenforceable under general contract terms because I find it without merit.

---

[77]     Defs.' Post-Trial Br. 21.

[78]     *See Mariucci v. DeSantis*, 1997 WL 61125, at *4 (Del. Ch. Oct. 14, 1997).

[79]     8 *Del. C.* § 141(b).

[80]     EDWARD P. WELCH ET AL., *supra* note 71, § 141.05 at 4-317.

**3.    Was Martin's unconditional resignation obtained under false pretenses?**

Martin argues that his "resignation is ineffective, invalid and voidable because it was improperly obtained under false pretenses and as a result of Defendants' and [Tomasek's] misrepresentations and knowing silence."[81]   Because Plaintiff frames this argument in terms of contract principles, Defendants contend that my conclusion that Martin's resignation letter is not a contract preempts this argument.   Although I determined above that Martin's written resignation constituted a statutory, rather than contractual, instrument, this Court has held that "a resignation will be deemed invalid if obtained through trickery or misrepresentation."[82]   As a result, Martin's claim that his resignation was invalidly obtained via Defendants' misrepresentations does not depend on a finding that his resignation letter was a contractual document.[83]

---

[81]    Pl.'s Post-Trial Br. 45-46.

[82]    *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 458 (Del. Ch. 2012).

[83]    *Id.* (comparing ineffective resignations obtained by trickery or misrepresentation to other non-contractual board actions invalidated by such conduct (citing *Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978, at *3 (Del. Ch. Dec. 13, 2007) ("Where a director is tricked or deceived about the true purpose of a [special] board meeting, and where that director subsequently does not participate in that meeting, any action purportedly taken there is invalid and void."); *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 436 (Del. Ch. 1972) ("A quorum obtained by trickery is invalid and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held."))).

### a.      Legal standard

Transactions entered into in reliance on material misrepresentations are voidable.[84]

For a transaction to be voidable, a plaintiff must show: "(1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent or material; (3) that the misrepresentation induced the recipient to enter into the contract; and (4) that the recipient's reliance on the misrepresentation was reasonable."[85]  A misrepresentation is an assertion that is not in accordance with the facts and is material if it would induce a reasonable person to manifest his assent.[86]  In addition, "fraud does not consist merely of overt misrepresentations, but 'may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.'"[87]

### b.      Application

Martin asserts that Defendants' misrepresentations induced his unconditional resignation from the Board.  Martin highlights Tomasek's communications with him and argues that Tomasek acted on behalf of the Board in those interactions.  Specifically, Plaintiff claims that Tomasek misrepresented the legal effect of the second resignation

---

[84]     *See Naughty Monkey LLC v. MarineMax Ne. LLC*, 2011 WL 4091851, at *3 (Del. Ch. Aug. 31, 2011) ("[A] party may escape a contract which it was induced to enter by the other party's fraudulent or material misrepresentation . . . ." (citing *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997))).

[85]     *Alabi v. DLH Airways, Inc.*, 583 A.2d 1358, 1361-62 (Del. Super. 1990) (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 159, 164 (1981)).

[86]     *Id.*

[87]     *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

letter by failing to inform Martin that: (1) the Board had decided to vet Lipes and Rainey before appointing them as directors; and (2) Tomasek had removed the condition that was present in the first resignation letter at the Board's request. As to the first point, the evidence is unclear regarding whether Tomasek communicated to Martin that the Board wanted to vet Lipes and Rainey before appointing them as directors. If I credit Tomasek's testimony that he did communicate the Board's intentions to Martin, I find it more likely than not that Tomasek also gave Martin the impression that the vetting merely was a formality.[88] For example, Tomasek testified that he told Martin that "they're going to interview these guys, I'm sure that these guys are going to be qualified . . . ."[89] Tomasek acknowledged, however, that he was aware that Martin, at all times, intended for his resignation to be contingent on the appointment of Lipes and Rainey to the Board.[90] Yet, the only contingency regarding the appointment of Lipes and Rainey that Tomasek unquestionably did mention to Martin was the need for the Company's D&O insurance policies to be effective. There is no evidence that anyone expected that issue to be problematic, and ultimately it was not.

---

[88]  Tr. 270 (Martin) ("The board resolution [appointing Lipes and Rainey to the Board] was a fait accompli as far as I was concerned.").

[89]  Tomasek Dep. 119.

[90]  Tomasek Dep. 52-53.

Regarding the second alleged misrepresentation, Tomasek testified that he did discuss the change to the resignation letter with Martin.[91] But, the documentary evidence provides no support for that allegation.[92] Having considered the evidence of record, I find it more likely than not that Martin still believed that his resignation was conditioned on Lipes and Rainey's appointment to the Board when he signed the unconditional resignation and that Tomasek knew that and did nothing to dissuade Martin from that notion.

Because Tomasek, as the Board's agent, remained silent as to the unconditionality of Martin's resignation despite knowing Martin would not have tendered his resignation had he understood it to be unconditional, the Board obtained Martin's unconditional resignation via Tomasek's material misrepresentations. In addition, under Delaware law, a corporation generally is "liable for the acts and knowledge of its agents—even when the agent acts fraudulently or causes injury to third persons through illegal conduct."[93] Tomasek was the Company's corporate counsel from 2012 until December 2014,[94] and Defendants concede that he was acting as the Board's agent in his interactions with

---

[91]    *Id.* at 52.

[92]    JX 73 (email from Tomasek to Martin with the second, unconditional resignation letter attached containing no discussion of the removal of the condition from the first, conditional resignation letter).

[93]    *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 302 (Del. Ch. 2015); *see also In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009) (citing *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1996 WL 111133, at *2 (Del. Super. Feb. 22, 1996)).

[94]    Tr. 23 (Finley).

33

Martin regarding his resignation.[95] Thus, Tomasek's inducement of Martin to execute the unconditional resignation letter under false pretenses is imputed to Med-Dev.

Defendants argue that had Martin simply read both the first and second versions of the resignation letter, he likely would have recognized that the second letter, which he executed, was unconditional. According to Defendants, Martin's failure to notice the plain unconditionality of the second resignation letter renders his reliance on any misrepresentation by Tomasek unjustifiable.[96] The reasonableness of Martin's reliance on Tomasek's alleged misrepresentations, however, must be considered in the context of the surrounding circumstances including his prior communications with Tomasek.

Tomasek sent Martin the Written Consent along with the first resignation letter on April 18, and the Written Consent reflected Martin's intent that his resignation be conditional on the appointment of Lipes and Rainey to the Board.[97] Martin testified that he believed the Written Consent was the crucial document in terms of effectuating his

---

[95] Defs.' Post-Trial Br. 28 n.13 (noting that Tomasek was "acting as Med-Dev's agent" when negotiating and drafting Martin's resignation).

[96] *Carrow v. Arnold*, 2006 WL 3289582, at \*11 (Del. Ch. Oct. 31, 2006) ("It is unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement. 'Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation.' Because [the plaintiff] had such an opportunity, any reliance he placed on prior, inconsistent, oral promises or representations was unreasonable." (footnotes omitted) (quoting 17A AM. JUR. 2D CONTRACTS § 214 (2006))).

[97] *See supra* note 20.

desire that Lipes and Rainey be appointed to the Board upon his resignation.[98] The record also shows that Martin mistakenly believed that the Board had to accept his resignation by way of a Board resolution—*i.e.*, that the Written Consent was necessary to effectuate his resignation. That belief may have resulted from Tomasek sending Martin the Written Consent to Martin along with the first version of the resignation letter on April 18, which suggests that those two documents should be read in conjunction with one another. Because Tomasek did not send a second board resolution or written consent with the second version of the resignation letter, it appears that Martin reasonably assumed that the Written Consent had not changed.[99] Further, in his April 18 email, Tomasek affirmatively stated that "[Lipes and Rainey] shall only be appointed once the D&O insurance is bound . . . ,"[100] but mentioned no other contingency.

After Martin indicated to Tomasek his willingness to resign from the Board on the condition that Lipes and Rainey be elected to the Board, Tomasek conveyed that idea to Finley, who said it was a "good idea."[101] On April 18, Tomasek forwarded the first draft resignation letter and the Written Consent to the Board for their review. In a conference call that day that did not include Martin, the other Board members asked Tomasek to remove the contingency in the resignation letter so that they could vet the qualifications

---

[98]    Tr. 266-70.

[99]    *See id.*

[100]    JX 70.

[101]    Tomasek Dep. 40.

of Lipes and Rainey first.[102]  As a result of that conversation, Tomasek sent Martin the second, unconditional draft of the resignation letter.  Thus, when Tomasek communicated with Martin by email and orally on April 19, he knew that Finley and other Board members were qualifying their willingness to appoint Lipes and Rainey as directors on vetting them first.  Nonetheless, I am not convinced that Tomasek communicated that fact to Martin before Martin executed the purportedly unconditional resignation letter.  But, even if Tomasek did mention the Board's intention to vet Lipes and Rainey to Martin, the evidence shows that he more than likely implied it was a mere formality and that both of them would qualify as directors.  Tomasek also did not inform Martin that he had changed the resignation letter because Finley and the other directors instructed him to make it unconditional.  In these circumstances, I find that Tomasek, as Med-Dev's agent, had a duty fully and fairly to disclose at least the vetting condition to Martin, which he failed to do.[103]

---

[102]   *Id.* at 118-19.

[103]   Defendants seem to allege that they expected their vetting of Lipes and Rainey to be more than a mere formality.  Indeed, because neither Lipes nor Rainey ever was nominated as a director, let alone appointed, it is questionable whether Finley or the Board ever intended to consider them seriously.  Even if they did, however, the record proves that they never questioned their qualifications.  Rather, Finley and those aligned with him objected to Lipes and Rainey's apparent allegiance to Martin.  It is not clear whether Tomasek understood this on April 19, but it is largely immaterial to my decision.  If he did, he should have been more forthright with Martin as to the vetting requirement.  If he did not, I infer from the evidence that the Med-Dev Board did not disclose that information to him.

Taking all of these factors into account, I find it reasonable: (1) that Martin believed the Written Consent, rather than the resignation letter, was the controlling document in terms of assuring that Lipes and Rainey would be appointed to the Board; (2) that Martin believed, because Tomasek did not send him an updated board resolution, that the original Written Consent still would be used; and (3) for Martin to have relied on Tomasek's representation that Lipes and Rainey would be appointed once Martin resigned and the D&O insurance policies were effective. Thus, despite Martin's careless failure to compare the terms of the first resignation letter to the second resignation letter, his reliance on Tomasek's material misrepresentation by silence in the face of a duty to speak as to the conditionality of Martin's resignation was reasonable.

I conclude, therefore, that Martin's unconditional resignation letter was obtained by Tomasek's misrepresentations as to whether his resignation was conditioned on the appointment of Lipes and Rainey to the Board. Martin reasonably relied on those misrepresentations, and they were material because they induced Martin's unconditional resignation. As a result, absent a successful equitable defense by Defendants, equity demands that Martin's unconditional resignation be invalidated.

### c. Defendants' equitable defenses

Defendants argue that even if this Court finds that Martin's resignation was obtained through false pretenses, Martin's claim to invalidate that resignation should be barred by various equitable defenses. Although they included waiver, acquiescence, and estoppel among their asserted defenses in the Joint Stipulation and their Pre-trial Brief, Defendants relied only on laches in their Post-Trial Brief. That may be because Martin

37

responded to all four of Defendants' equitable defenses by invoking the unclean hands doctrine. Beyond that, Martin said little or nothing about the specific defenses of waiver, acquiescence, or estoppel. Hence, I will focus my analysis on whether Plaintiff's claim to invalidate his resignation under Section 225 of the DGCL is time-barred by laches.

### i. Acquiescence, estoppel, and waiver

Before addressing laches, I pause briefly to discuss Defendants' other equitable defenses. As to their acquiescence and estoppel defenses, Defendants assert that the Board materially has changed its positions in reliance on Martin's unconditional resignation and note that they would be prejudiced by "Martin's attempt to invalidate all acts occurring after the date of his resignation" in his initial proposed second amended complaint.[104] Defendants contend that Martin, therefore, is barred by acquiescence and estoppel from challenging the validity of his resignation.[105] In the final second amended complaint—*i.e.*, the Complaint—filed just before trial, however, Martin, at my instruction,[106] removed the paragraphs in the initial proposed second amended complaint that Defendants had cited as challenging all of the Board's actions taken after his

[104]  Defs.' Pretrial Br. 35 (citing Joint Pretrial Stipulation and Order, Docket Item ("D.I.") 61, Ex. A ¶¶ 104-108).

[105]  *Id.* (citing *Nevins v. Bryan*, 885 A.2d 233, 246-50 (Del. Ch. 2005) (Section 225 claim barred by acquiescence, estoppel, and laches in part because the defendants continued to carry on business after the allegedly defective act)).

[106]  At the Pretrial Conference, I noted that the initial proposed second amended complaint could be prejudicial to Defendants because it sought the removal of all directors appointed to the Board after April 19, 2014. Martin's counsel then agreed to consider modifying the proposed amended pleading to narrow that request. *See* Pretrial Conference Tr. 6.

purported retirement.[107]  As a result, Defendants' acquiescence and estoppel arguments (as distinguished from laches) effectively are mooted because Martin's claim has been limited such that the only Board action he seeks to challenge as a result of his allegedly invalid resignation is the appointment of Albanese to Martin's seat.

As to their waiver defense, Defendants argue that Martin violated his "duty to speak because he believed the Board had violated his rights and had acted impermissibly," and yet did not object to the alleged violations.[108]  Defendants' assertion, however, is contradicted by Martin's prompt attempt to retract of his resignation on May 2, 2014, upon learning from Tomasek that the Board had "backed out of the deal."[109]  To the extent Defendants claim that Martin delayed unreasonably after May 2 in bringing this action and thereby waived his claims, I reject that argument in the context of my laches analysis below.  Thus, Defendants' equitable defenses of acquiescence, estoppel, and waiver do not entitle them to anything more than what is discussed elsewhere in this Memorandum Opinion.

---

[107]  *Compare* Joint Pretrial Stipulation and Order, D.I. 61, Ex. A ¶¶ 104-108 (requesting that the Court declare that Martin is the rightful Chairman of the Board and that Albanese and any other director appointed after April 19, 2014 shall cease acting as a member of the Board), *with* Pl.'s Motion to File Amended Compl., D.I. 70, Ex. D ¶¶ 104-108 (requesting only that the Court declare that Martin is the rightful Chairman of the Board and that Albanese shall cease acting as a member of the Board).

[108]  Defs.' Pretrial Br. 36 (citing *Brittingham v. Bd. of Adjustment of Rehoboth Beach*, 2005 WL 170690, at *5 (Del. Super. Jan. 14, 2005) ("When a duty to speak exists, it is said that 'silence gives consent.'")).

[109]  Tr. 173 (Martin).

### ii.      Laches

Because it is an affirmative defense, Defendants bear the burdens of proof and persuasion on the issue of laches.[110]  "Laches is an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right, and resulting in prejudice to the adverse party."[111]  "In the Section 225 context, a delay of even a month and a half has been held sufficient to bar a claim under the doctrine of laches."[112]

Martin discovered that the Board definitively had decided not to appoint Lipes and Rainey as directors and purported to retract his resignation on May 2, 2014.[113]  Plaintiff did not commence this action, however, until January 7, 2015.  According to Defendants, this "eight month delay in challenging the Board's composition is unreasonable."[114]  And, in that eight-month time period, Defendants claim they materially changed their positions in reliance on Martin's unconditional resignation by notifying investors and other third parties of his resignation and by appointing Finley to succeed Martin as the CEO and

---

[110]    *See* Ct. Ch. R. 8(c); *Penn Mart Supermkts., Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *5 n.40 (Del. Ch. Dec. 15, 2005) (citing *Warwick Park Owners Ass'n, Inc. v. Sahutsky*, 2005 WL 2335485, at *4 (Del. Ch. Sept. 20, 2005)).

[111]    *Whittington v. Dragon Gp., L.L.C.,* 991 A.2d 1, 7 (Del. 2009) (citing *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009)).

[112]    *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013) (citing *Stengel v. Rotman*, 2001 WL 221512 (Del. Ch. Feb. 26, 2011)).

[113]    *See supra* notes 40-43 and accompanying text; *see also* Martin Dep. 34 (stating that he knew in early May 2014 that he was not going to be put back on the Board, even after attempting to retract his resignation).

[114]    Defs.' Pre-Trial Br. 35.

Kevin Finley and Garver to the Board.[115] Plaintiff's eight-month delay is even longer than the month and a half and seven-month delays that gave rise to successful laches defenses in the context of Section 225 claims in the *Stengel* and *Klaassen* cases, respectively.[116] The courts have held, however, that "[t]he length of the delay is less important than the reasons for it."[117]

In his briefs, Martin does not defend the reasonableness of his delay in bringing this action other than by reference to the LCDA criminal investigation that provides the basis for his unclean hands response. Martin testified, for example, that he "had to wait until the gun to [his] head was away in Lackawanna County"—*i.e.*, until the criminal investigation over his Company expenses was completed—and that he "didn't sue because of the lack of bandwidth due to the criminal . . . investigation."[118] Thus, Martin essentially argues that it would be unreasonable to expect him to have defended himself in the Lackawanna County criminal investigation and pursued his Section 225 claims simultaneously.

Rather than contesting the merits of Defendants' laches defense, Plaintiff instead asserts that Defendants' equitable defenses are precluded by their unclean hands. This

---

[115] *See Nevins*, 885 A.2d at 246-50 ("By waiting a year to bring suit, [the plaintiff] jeopardized all of the actions taken by the Board during that year.").

[116] *Klaassen*, 2013 WL 5739680, at *20; *Stengel*, 2001 WL 221512, at *6-7.

[117] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011) (citing *Whittington*, 991 A.2d at 8).

[118] Tr. 289; Martin Dep. 34-35.

41

Court has "broad discretion when applying the unclean hands doctrine" and may "refuse[] to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."[119]

Martin avers that "Defendants conduct before this litigation was fraudulent and egregious thereby barring them from presenting equitable defenses under the unclean hands doctrine . . . ."[120] Specifically, Plaintiff refers to: (1) Defendants' inducement of Martin's resignation under false pretenses; and (2) Defendants' pursuit of criminal charges against Martin in Lackawanna County. Martin avoided, however, accusing Tomasek of fraudulent behavior. Instead, Plaintiff based his claim that his unconditional resignation was induced under false pretenses, which I found persuasive *supra*, on Tomasek's *material*, rather than *fraudulent*, misrepresentations.[121] Plaintiff concedes that the record is "unclear" as to "[w]hether . . . Tomasek willfully misled Martin as to the legal effect of his resignation."[122] Martin also testified explicitly that he was not aware of any fraud committed against him by Tomasek and that he "would use Joe Tomasek in a

---

[119] *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *6 (Del. Ch. Feb. 27, 2009) (quoting *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998)) (citing *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000)).

[120] Pl.'s Post-Trial Br. 68.

[121] *See supra* note 85 and accompanying text (noting that a transaction is voidable if induced by *either* a fraudulent *or* a material misrepresentation).

[122] Pl.'s Post-Trial Br. 18.

heartbeat in the future to do a start-up."[123]  Martin's unclean hands argument, therefore, rests entirely on Defendants' conduct in connection with the Lackawanna County criminal investigation.

As to that criminal investigation, I conclude that, under the circumstances, Martin's focus on defending himself in that process provided a reasonable basis for his delay in bringing this action.[124]  Martin's participation included responding to detective Bauer's search warrant, engaging in settlement negotiations, engaging two different defense attorneys, and meeting with Bauer for an interview.[125]  It also is true, however, as Defendants emphasize, that the criminal investigation ended over three months later on October 1, 2014, and Martin did not commence this action until January 7, 2015.  But, Defendants have failed to point to any Board action taken during that time period that would constitute a material change of position in reliance on Martin's delay in bringing this action.[126]

---

[123]   Tr. 272-73.

[124]   *See Stewart v. Wilm. Trust SP Servs., Inc.*, 112 A.3d 271, 296 (Del. Ch. 2011) (finding that a plaintiff's delay in bringing an action was not unreasonable for laches purposes when that delay was occasioned by a substantial amount of litigation activity in a related action).

[125]   *See supra* Section I.B.6.

[126]   As noted previously, Martin will be precluded from challenging any action taken by the Med-Dev Board between April 19, 2014 and the date of this Memorandum Opinion based on the allegedly improper composition of the Board.  *See supra* notes 106-107 and accompanying text.

43

Regardless of whether Defendants' conduct was fraudulent and egregious, as Plaintiff characterized it, their role in initiating and steadfastly encouraging the prosecution of their criminal allegations—especially after Bauer concluded that insufficient evidence of criminal behavior existed to warrant continuing the investigation—precludes Defendants from using the delay occasioned by that conduct as an equitable defense. Defendants argue that because the LCDA put its investigation on hold during the parties' settlement discussions, Martin had an opportunity to bring his Section 225 claims. Defendants ignore, however, the fact that those settlement negotiations called for Martin either to relinquish his interest in the Company or risk criminal prosecution.[127] If Martin was considering accepting Defendants' settlement agreement, he would have had no incentive to bring his Section 225 claims as he no longer would have been a Med-Dev stockholder.

For all of these reasons, I find that Defendants have not carried their burden as to their laches defense. Because Martin's resignation was obtained under false pretenses and he did not delay unreasonably his initiation of this action or thereby cause prejudice to Med-Dev such that it is time-barred by laches, I conclude that his unconditional resignation should be invalidated. Martin never executed the first, conditional

---

[127]    JX 101.

44

resignation letter, so that letter also is ineffective. As a result, Martin should be returned to his position as Chairman of the Board.[128]

### C. The Validity of Albanese's Position on the Board

In addition to disputing the effectiveness of his own resignation, Martin also argues that Albanese's position on the Board is invalid. Plaintiff points to Finley's notes from the Board's April 29, 2014 meeting as indicating that the Board appointed Albanese to Martin's vacated position.[129] Although it is undisputed that the Board unanimously expanded the Board's size by one seat and selected Albanese for that seat on January 16, 2014,[130] Martin contends that Finley's notes from the Board's April 29 meeting are conclusive evidence that, at some point after his January 16 appointment, Albanese resigned from the Board. As I found *supra*, however, the evidence does not support that

---

[128] Although the parties focused their briefs on whether Martin should be reappointed to the Board and his position as Chairman, his resignation applied to both his position as Chairman of the Board *and* as the Company's CEO. Section 225 of the DGCL applies to disputes over corporate directors and officers. 8 *Del. C.* § 225(a) ("[T]he Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office."). In the Pretrial Stipulation and in Martin's Pre- and Post-Trial Briefs, however, he sought only reinstatement as Chairman of Med-Dev's Board. Thus, I conclude that he has waived any claim for reinstatement as CEO. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). In addition, Defendants' affirmative defense of laches would be stronger as to Martin's position as CEO because such relief could cause greater uncertainty as to the day-to-day actions taken by Med-Dev's CEO Finley between May 2, 2014 and today.

[129] JX 72.

[130] JS ¶¶ 15-22.

45

conclusion.[131] Rather, because Plaintiff has not presented any direct evidence of Albanese's resignation from the Board before mid- to late-April 2014, I found it more likely that Finley's notes simply reflect the Board's decision to assign Albanese, as a current Board member, to the Chairman position that purportedly was vacated by Martin's unconditional resignation ten days earlier.[132]

Because Albanese validly was appointed to the Board on January 16, 2014 and did not resign afterwards, his status as a director is not affected by my conclusion that Martin should be reinstated. As to Albanese's appointment to Martin's purportedly vacant Chairman position, however, I conclude that that appointment was invalid. Because Martin's resignation was ineffective when it was made, he never vacated the Chairman position, and Albanese could not have been selected to replace him. The same reasoning applies to the Board's selection of Kevin Finley to fill Albanese's purportedly vacant seat.[133] Thus, I conclude that: (1) Albanese should be removed from his position as Chairman of the Board; (2) Albanese should remain a member of the Board; (3) Martin should be reinstated as a director and Chairman of the Board; and (4) Kevin Finley should be removed from the Board altogether.

---

[131]   *See supra* notes 9, 32.

[132]   *See supra* note 32.

[133]   JX 104 at P_000510 (stating that Kevin Finley was appointed to fill the seat on the Board vacated by Albanese when Albanese took Martin's seat as Chairman).

46

## D. The Parties' Competing Requests for Attorneys' Fees

Martin claims that he is entitled to the attorneys' fees and expenses he incurred during the Lackawanna County criminal investigation due to Defendants' "fraudulent and egregious" conduct in connection with that investigation.[134] Besides denying Plaintiff's claims, Defendants assert that they are entitled to their attorneys' fees and expenses incurred in connection with Martin's "frivolous" Old Albanese Claim.[135] After describing the legal standard applicable to both parties' requests for attorneys' fees, I address each of their claims *seriatim*.

---

[134] Plaintiff also asserted, in his Pretrial Brief, that he is entitled to his attorneys' fees incurred in this action based on Tomasek's "fraudulent misrepresentation[s]." Pl.'s Pretrial Br. 39. As I concluded *supra*, however, while Tomasek did make a material misrepresentation, the evidence does not support a finding that he acted fraudulently, and Martin conceded as much at trial and in his Post-Trial Brief. *See supra* notes 121-123 and accompanying text. I reject, therefore, any attempt by Plaintiff to rely on Tomasek's conduct as a basis for his request for attorneys' fees.

[135] In their Post-Trial Brief, Defendants sought their attorneys' fees related to all iterations of Martin's attempts to remove Albanese from the Board, including the New Albanese Claim. Defs.' Post-Trial Br. 42. Based on Finley's notes from the April 29, 2014 meeting and Tomasek's testimony—which indicated that the Board only included Martin, Finley, Peters, and Moore—I conclude that Plaintiff had a reasonable, albeit ultimately unpersuasive, basis for believing that Albanese had resigned at some point after his January 16, 2014 appointment to the Board. *See supra* notes 9, 32. Thus, the New Albanese Claim does not support an award of attorneys' fees under the bad faith exception to the American Rule. As I indicated in my June 11, 2015 order granting Plaintiff's motion to amend his complaint to comport with evidence obtained during discovery, however, Defendants are entitled to seek attorneys' fees in connection with the Old Albanese Claim. *See supra* Section I.C. I therefore limit my analysis of Defendants' request for attorneys' fees to the Old Albanese Claim.

## 1. Legal standard

Under the American Rule, each party must bear its own litigation expenses, including attorneys' fees, absent an exception that warrants a shifting of such fees.[136] Under one well-recognized exception to this rule, a court may award attorneys' fees in cases where the court finds that a party brought the action in bad faith or that a party acted in bad faith or vexatiously to increase the costs of litigation.[137] "[T]his Court does not lightly award attorneys' fees under this exception, and has limited its application to situations in which a party acted vexatiously, wantonly, or for oppressive reasons."[138] "The party invoking the bad faith exception 'bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct' by the opposing party."[139]

"There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."[140] The Delaware Supreme Court has held that a party engages in bad faith conduct "sufficient for awarding attorneys fees to its opponent when it (i)

---

[136] *See, e.g., Israel Discount Bank of N.Y. v. First State Depository Co.*, 2013 WL 2326875, at *28 (Del. Ch. May 29, 2013); *Nichols v. Chrysler Gp. LLC*, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010).

[137] *See, e.g., Israel Discount Bank*, 2013 WL 2326875, at *28; *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 3876199, at *24 (Del. Ch. Aug. 20, 2008).

[138] *Postorivo*, 2008 WL 3876199, at *24.

[139] *Marra v. Brandywine Sch. District*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850-51 (Del. Ch. 2005)).

[140] *Israel Discount Bank*, 2013 WL 2326875, at *28 (citing *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880 (Del. Ch. 2012)).

defends the action despite knowledge there is no valid defense, (ii) delays the litigation and assert[s] frivolous motions, (iii) falsifies evidence, and (iv) changes his or her testimony to suit his or her needs."[141] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[142]

### 2. Is Plaintiff entitled to attorneys' fees from Defendants?

Considering the standard set forth above, I conclude that Martin is not entitled to an award of his attorneys' fees against Defendants based on their actions during the Lackawanna County criminal investigation. As an initial matter, the legal standard set forth above largely relates to conduct taken during litigation rather than before it commences.[143] Even if the bad faith exception to the American Rule did permit fee-

---

[141] *P.J. Bale, Inc. v. Rapuano*, 2005 WL 3091885, at *1 (Del. Nov. 17, 2005) (TABLE) (citing *Montgomery Cellular Hldg. Co., v. Dobler*, 880 A.2d 206, 228 (Del. 2005)).

[142] *Nichols*, 2010 WL 5549048, at *3.

[143] *In re Grupo Dos Chiles, LLC*, 2006 WL 2507044, at *2 (Del. Ch. Aug. 17, 2006) ("[A]n award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action." (citing *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998))). Plaintiffs cite to *Paron Capital Management, LLC v. Crombie* for the proposition that conduct giving rise to the underlying cause of action can support an award of attorneys' fees. 2012 WL 2045857 (Del. Ch. May 22, 2012). As Defendants point out, however, the attorneys' fee award in *Paron Capital* constituted a portion of the tort damages resulting from the defendant's fraudulent behavior. *Id.* at *15 ("Here, [the defendant] committed an extensive and calculated fraud that resulted in severe damage to the reputations and livelihoods of [the plaintiffs]. The prosecution of this action to clear Plaintiffs' names, among

49

shifting based on pre-litigation conduct, however, Defendants' complained-of actions here do not rise to the level of bad faith sufficient to justify an award of attorneys' fees.

Given the fact that Defendants' allegations against Martin to the LCDA were sufficient to persuade detective Bauer to initiate her investigation and provided probable cause for the issuance of a search warrant of Martin's bank records, there appears to have been a reasonable basis for making those complaints. Plaintiff also contends that Defendants acted in bad faith by proposing a settlement under which they drop their efforts to have criminal charges brought against Martin in exchange for his relinquishment of his interests in the Company because such a proposal violates various Pennsylvania and federal laws and rules of professional ethics.[144] Based on the record here, however, I conclude that those contentions do not justify an award of attorneys' fees against Defendants. Martin has admitted that at least two of the challenged expenditures he charged to Med-Dev were mistaken and, in fact, represented personal charges. Minora sent Martin's counsel the disputed settlement proposal on July 25, 2014. But, Minora

---

other things, is a direct and foreseeable consequence of [the defendant's] wrongdoing."). Because Martin did not assert a similar tort claim against Defendants in this case, I consider the fee award for pre-litigation conduct in *Paron Capital* to be inapposite.

[144] Pl.'s Post-Trial Br. 68-69 ("Defendants' settlement agreement and the ultimatum communicated by Attorney [Minora] violate state and federal law. The Commonwealth of Pennsylvania prohibits 'theft by extortion,' 'blackmail,' 'blackmail by injury to reputation or business,' and 'blackmail by accusation of heinous crime.' The Federal Travel Act also forbids the use of the U.S. mail, or interstate or foreign travel, for the purpose of engaging in unlawful acts, including extortion." (footnotes omitted)).

made that proposal in response to a request by Martin for a stay of the investigation, while the parties explored a settlement. Defendants acceded to that request. By August 28, 2014, Martin had retained new defense counsel, who objected to the propriety of the proposed settlement offer on ethical grounds, among others. Defendants promptly withdrew it. In addition, the LCDA closed its investigation on or about October 1, 2014.

In these circumstances, while the settlement terms proposed by Defendants' counsel may have been improper, the manner in which the proposal arose and the relative alacrity with which the investigation was terminated convince me that this situation does not involve such extraordinary circumstances that fee-shifting would be appropriate to deter abusive litigation and protect the integrity of the judicial process. Martin, therefore, has not demonstrated that he is entitled to fee-shifting under the bad faith exception to the American Rule.

### 3. Are Defendants entitled to attorneys' fees from Plaintiff?

Defendants are entitled to a partial award of their attorneys' fees against Plaintiff. Defendants have shown that, although the Old Albanese Claim was so meritless that it bordered on frivolous, Martin refused to abandon it until shortly before trial. I conclude, therefore, that his persistent pursuit of the Old Albanese Claim until then constitutes bad faith. As Defendants point out, the Board plainly was authorized under the DGCL,[145] the

---

[145] 8 *Del. C.* § 223(a)(1) ("Unless otherwise provided in the certificate of incorporation or bylaws: (1) Vacancies and newly created directorships . . . may be filled by a majority of the directors then in office . . . .").

Bylaws,[146] and Med-Dev's charter[147] to expand its size and appoint a director to the newly created vacancy.[148] Moreover, even if Martin had a reasonable basis for challenging the validity of Albanese's appointment, his claim likely would have been barred by Defendants' equitable defenses because Plaintiff arguably: (1) acquiesced by voting in favor of Albanese's appointment at the January 16, 2014 meeting; (2) waived his objection by failing to challenge Albanese's appointment after that meeting; and (3) was subject to laches because he did not bring a Section 225 claim during the three

---

[146]     JS ¶ 8 ("Bylaws Article III(11)(a) states, '[t]he number of directors constituting the initial Board of Directors shall be fixed by the Incorporator. Thereafter, the number of directors may be fixed, from time to time, by the affirmative vote of a majority of the entire Board of Directors or by action of the stockholders of the Corporation.'"); JS ¶ 11 ("Bylaws Article III(11)(d) states, '[a]ny vacancy in the Board of Directors, whether arising from death, resignation, removal (with or without cause), an increase in the number of directors or any other cause, may be filled by the vote of a majority of the directors then in office, though less than a quorum, or by the sole remaining director or by the stockholders at the next annual meeting thereof or at a special meeting thereof.'").

[147]     JS ¶ 5 ("Certificate of Incorporation VII.1 states, 'the number of the Directors of the Corporation shall be fixed from time to time exclusively pursuant to a resolution adopted by a majority of the Whole Board (but shall not be less than one).'"); JS ¶ 6 ("Certificate of Incorporation VII.1 states, '[a]ny vacancy in the membership of the Board of Directors may be filled by appointment pursuant to a resolution adopted by a majority of the Whole Board.'"); JS ¶ 7 ("Certificate of Incorporation VII.3 states, 'newly created directorships resulting from any increase in the number of Directors and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled by the affirmative vote of a majority of the remaining Directors then in office, even though less than a quorum of the Board of Directors, and not by the stockholders.'").

[148]     *See* Defs.' Pre-Trial Br. 38-40.

months between that meeting and his purported resignation on April 19, let alone the period from that date until he filed this action on January 7, 2015.

While the standard for shifting fees pursuant to the bad faith exception to the American Rule is a stringent one, Martin's dogged pursuit of the borderline frivolous or near frivolous Old Albanese Claim meets that standard because it utterly lacked any legal or factual bases. The only grounds Plaintiff submitted in support of the Old Albanese Claim were the provisions in the bylaws relating to the nomination of directors for elections at annual and special meetings of stockholders.[149] These provisions have no relevance to the circumstances in which Albanese was appointed to the Board. Martin's prosecution of the Old Albanese Claim despite the plain language of the Bylaws demonstrates a disconcerting lack of diligence and constitutes bad faith litigation. As a result, I conclude that Defendants are entitled to reasonable attorneys' fees and expenses relating to the Old Albanese Claim of up to the $67,546.09 that they attested to and requested in their Post-Trial Brief, subject only to submission of appropriate documentation indicating that Defendants spent at least that much on that claim.[150]

## III. CONCLUSION

For the foregoing reasons, I grant Plaintiff's request for a declaratory judgment as follows: (1) that Martin is entitled to reinstatement as a Med-Dev director and Chairman of the Board and to the removal of Albanese as Chairman; and (2) that Kevin Finley must

---

[149] Pl.'s Verified Am. Compl., D.I. 15, ¶¶ 26-30, 81-86.

[150] Defs.' Post-Trial Br. 44.

be removed from the Board.  I deny Plaintiff's request for declaratory relief under Section 225 of the DGCL as to Albanese's removal from the Board, as well as Plaintiff's request for attorneys' fees.  I grant Defendants' request for an award of their reasonable attorneys' fees and expenses against Plaintiff of up to $67,546.09 relating to the Old Albanese Claim, subject to submission of appropriate documentation.

An implementing order accompanies this Memorandum Opinion.